## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARY K. BOLEY, KANDIE SUTTER and  )
PHYLLIS JOHNSON, individually and on  )
behalf of all others similarly situated,  )
                                        )

                  Plaintiffs,  )  **CIVIL ACTION NO.**:
                                          )

        v.  )  **CLASS ACTION COMPLAINT**

UNIVERSAL HEALTH SERVICES, INC.,  )
THE BOARD OF DIRECTORS OF  )
UNIVERSAL HEALTH SERVICES, INC.,  )
THE PLAN COMMITTEE OF  )
UNIVERSAL HEALTH SERVICES, INC.,  )
and JOHN DOES 1-30.  )
                                          )
                  Defendants.  )

## <u>COMPLAINT</u>

Plaintiffs Mary K. Boley, Kandie Sutter and Phyllis Johnson ("Plaintiffs"), by and through their attorneys, on behalf of the Universal Health Services, Inc., Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.      INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Universal Health Services, Inc., ("UHS," "Universal" or the "Company"), the Board of Directors of Universal Health Services, Inc., ("Board"), and its members during the Class Period and the Plan Committee of Universal Health Services, Inc.,

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

("Administrative Committee" or "Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans.  *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.     In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015) ("*Tibble I*").  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

5.     The Plan has at all times, during the Class Period maintained over 1.3 billion dollars in assets (including having 1.9 billion dollars in assets in 2018), qualifying it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  These

assets are entrusted to the care of the Plan's fiduciaries.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.     Plaintiffs allege that during the putative Class Period (June 5, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or materially similar investment options with lower costs and/or better performance histories.

7.     To make matters worse, Defendants failed to consider lower cost collective trusts that were available to the Plan as alternatives to certain mutual funds in the Plan.

8.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

3

U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

11.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

13.     Plaintiff Mary K. Boley ("Boley") resides in Anna, Texas.  During her employment, Plaintiff Boley participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

14.     Plaintiff Kandie Sutter ("Sutter") resides in Corona, California.  During her employment, Plaintiff Sutter participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

15.     Plaintiff Phyllis Johnson ("Johnson") resides in Las Vegas, Nevada.  During her employment, Plaintiff Johnson participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit.

16.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts

currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

17.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.   Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.[2] Moreover, having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.   For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

18.    Universal Health Services, Inc., is the Plan sponsor.   *See* 2018 Form 5500 at 1.   Its corporate headquarters is located at 367 S. Gulph Road, King of Prussia, Pennsylvania.   UHS

---

[2]  *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

describes itself as "one of the nation's largest and most respected providers of hospital and healthcare services."[3] It "has 400 acute care hospitals, behavioral health facilities and ambulatory centers across the U.S., Puerto Rico and the U.K….and employs 90,000 employees."[4] In 2019, "UHS generated net revenues of approximately $11.4 billion, an increase of 5.6% over 2018." *See,* the December 31, 2019 Annual Report of Universal Health Services, Inc., at 6.

19. "The Company and its authorized representatives appointed by the Board of Directors are the Plan fiduciaries and the Plan Administrator." Summary Plan Description Handbook of Universal Health Services, Inc., Effective January 1, 2020 ("UHS 2020 SPD"), at 81. In executing their powers, the "Plan Administrator and Plan Sponsor have the authority to control and manage the operation and administration of the plan…." *Id.* at 92.

20. In addition, UHS is responsible for "selecting and removing Plan trustees, investment media, record-keepers and/or insurance companies." UHS 2020 SPD at 81. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

21. Additionally, at all times, UHS acted through its officers, including the Committee, to perform Plan-related fiduciary functions.

22. Lastly, UHS made discretionary decisions to make matching and discretionary contributions (explained below) to Plan participants. As described in the 2018 Audited Statement, UHS "contributes a discretionary amount of each participant's contribution to the Plan in accordance with Plan provisions…" *See,* the December 31, 2018 Audited Financial Statements of Universal Health Services, Inc., ("2018 Audited Statement") at 4.

---

[3] https://www.uhsinc.com/about-uhs/
[4] *Id.*

23.    For all the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

24.    The Board appointed "authorized representatives" of the Company, including the Committee, as Plan fiduciaries.  UHS 2020 SPD at 81.

25.    Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

26.    Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

27.    The Board and it members during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

28.    As noted in the 2018 Audited Financial Statement: "[t]he Company's Plan Committee … is the plan administrator." 2018 Audited Statement at 4.  "Participants direct the investment of their contributions … into various investment options selected by the Plan Committee." *Id.*

29.    Further, the Administrative Committee and its members, as "authorized representatives of the Company," appointed the trustee of the Plan. UHS 2020 SPD at 81. The Committee selected "Fidelity Trust Company" to act as the Plan trustee.  *Id.*  The Plan trustee, Fidelity Trust Company "shall be the named fiduciary with respect to management and control of

Plan assets held by it…" The Universal Health Services, Inc., Retirement Saving Plan Document as amended and restated effective January 1, 2017 ("2017 Plan Doc.") at 54.

30.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

31.     The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

32.     To the extent that there are additional officers and employees of UHS who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, UHS officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

### IV.     THE PLAN

33.     The Plan "which became effective January 1, 1985, is a defined contribution plan available to qualifying employees of Universal Health Services, Inc." 2018 Audited Statement at 4. The plan was amended and restated effective January 1, 1997. *See*, 2017 Plan Doc. at 1.

34.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA Section  3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  *See,* 2017 Plan Doc at 9.

Further, the 2020 SPD provides: "[t]he Plan is a defined contribution plan…" UHS 2020 SPD at 82. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### Eligibility

35.     As detailed in the 2018 Auditor Report: "[t]o be eligible to participate in the Plan, an employee must generally have completed at least one month of credited service and be 21 years of age." 2018 Auditor Report at 4.

### Contributions and Vesting

36.     There are several types of contributions that can be added to a participant's account: an employee salary deferral contribution, an employer matching contribution, and an employer profit sharing contribution.  UHS 2020 SPD at 72 and 73.  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id*.

37.     As described in the UHS 2020 SPD, a participant "can save from 1% to 75% of your eligible compensation on a pre-tax basis…." *Id.* In addition, "the Company will match a portion of your pre-tax and/or Roth after-tax contributions (your "Company Matching Contribution") each pay period.

38.     UHS made discretionary decisions about the matching and discretionary contributions to Plan participants.  2015 Plan Doc. at 25.  As described in the 2018 Audited Statement, UHS "contributes a discretionary amount of each participant's contribution to the Plan in accordance with Plan provisions…" 2018 Audited Statement at 4. As long as an employee is eligible to participate in the Plan, UHS will make contributions to each participants' accounts on the first day of eligibility.  *See,* UHS 2020 SPD at 71.

39.     Generally, "[p]articipants are immediately vested in their contributions plus actual earnings thereon. Vesting in the Company's contribution portion is based on years of continuous

service.  Generally, participants vest 25% each year and are fully vested after four years of service." 2018 Auditor Report at 4.

40.     Like other companies that sponsor 401(k) plans for their employees, UHS enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.  *See generally* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

41.     UHS also benefits in other ways from the Plan's matching program.  It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company.  By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with unhappy or lower-performing workers."  *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

42.     Given the size of the Plan, UHS likely enjoyed a significant tax and cost savings from offering a match.

### *The Plan's Investments*

43.     Several investments were available to Plan participants for investment each year during the putative Class Period, including several Fidelity target date funds.  As noted above, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance.  For 2018, the Plan offered 31 investment options, which included 29 mutual funds, 1 collective trust and 1 money market fund.

44.     The Plan's assets under management for all funds as of the end of 2018 was $1,914,043,716.  2018 Auditor Report at 2.  From 2014 to 2017 the Plan's assets under management ranged from $1.3 billion to $1.9 billion.

*Plan Expenses*

45.      "Certain expenses of maintaining the Plan are paid directly by the Plan …" 2018

Auditor Report at 6.

## V.      CLASS ACTION ALLEGATIONS

46.      Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the Plan, at
> any time between June 5, 2014 through the date of judgment (the
> "Class Period").

47.      The members of the Class are so numerous that joinder of all members is

impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 41,872 Plan "participants

with account balances as of the end of the plan year."  2018 Form 5500 at 2.

48.      Plaintiffs' claims are typical of the claims of the members of the Class.  Like other

Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of

Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other

Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all

Class members arise out of the same conduct, policies, and practices of Defendants as alleged

herein, and all members of the Class have been similarly affected by Defendants' wrongful

conduct.

49.      There are questions of law and fact common to the Class, and these questions

predominate over questions affecting only individual Class members.  Common legal and factual

questions include, but are not limited to:

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for
class certification or subsequent pleadings in this action.

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

50.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

51.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

52.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI. DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

53. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

54. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under Section 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

55. As described in the "Parties" section above, Defendants were fiduciaries of the Plan because:

    (a)    they were so named; and/or

    (b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

    (c)    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

56.     As fiduciaries, Defendants are/were required by ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law." *Sweda,* 923 F.3d at 333.

57.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.,* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

58.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of himself or third persons.

59.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under

ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent

ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting

investments." *Tibble I*, 135 S. Ct. at 1828.

60.     In addition, ERISA Section 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for

breach by co-fiduciary"), further provides that:

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances: (A) if he
> participates knowingly in, or knowingly undertakes to conceal, an
> act or omission of such other fiduciary, knowing such an act or
> omission is a breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his
> specific responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or (C) if he
> has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

61.     During the Class Period, Defendants did not act in the best interests of the Plan

participants.  Investments chosen for a plan are  not to favor the fund provider over the plan's

participants.  Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's

fiduciaries included and retained in the Plan many mutual fund investments that were more

expensive than necessary and otherwise not justified on the basis of their economic value to the

Plan or Plan participants.

62.     Based on reasonable inferences from the facts set forth in this Complaint, during

the Class Period Defendants failed to have a proper system of review in place to ensure that

participants in the Plan were being charged appropriate and reasonable fees for the Plan's

investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate

for: (1) lower expense ratios for certain investment options maintained and/or added to the Plan

during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

63.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.   Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

64.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

65.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that

is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

66.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

67.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees*," *supra*, at  2.

68.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."  *Id*., at 5.

69.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.      Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

70.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several investments in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

71.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options. *Tibble I*, 135 S. Ct. at 1823.  In *Tibble I*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts" and that, "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.*, at 1828.  In so holding, the Supreme Court referenced with approval the UPIA, treatises, and seminal decisions confirming the duty.

72.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts, ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

73.     When large plans, particularly those with over a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

74.    The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their higher costs relative to the same or similar investments available.   This fiduciary failure decreased participant compounding returns and reduced the available amount participants will have at retirement.

75.    During the Class Period, the Plan lost millions of dollars by offering investment options that had similar or identical characteristics to other lower-priced investment options.

76.    The majority of funds in the Plan stayed relatively unchanged during the Class Period.  In 2018, a majority of the funds in the Plan, at least 20 out of the Plan's 31 funds (65%) were much more expensive than comparable funds found in similarly-sized plans (plans having over a billion dollars in assets).  The expense ratios for funds in the Plan in some cases were up to *203%* (in the case of the Northern Small Cap Value fund) and *218%* (in the case of the MSIF Small Cap Growth IS fund) above the median expense ratios in the same category:[6]

| Plan Fund | Expense Ratio[7] | Category | ICI Median Fee |
|---|---|---|---|
| Fidelity Contra Class K | 0.73% | Domestic Equity | 0.33% |
| Fidelity Balanced Class K | 0.45% | Domestic Equity | 0.33% |
| Harbor Capital Appreciation Fund Inst Class | 0.68% | Domestic Equity | 0.33% |
| Neuberger Berman Genesis Fund R6 | 0.75% | Domestic Equity | 0.33% |
| Northern Small Cap Value Fund | 1.00% | Domestic Equity | 0.33% |

---

[6] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

[7]  The listed expense figures are as of 2019.

| Franklin Small Cap Growth Fund R6 | 0.65% | Domestic Equity | 0.33% |
|---|---|---|---|
| Wells Fargo Special Mid Cap Value R6 | 0.73% | Domestic Equity | 0.33% |
| Principal Midcap Fund Inst C1 | 0.69% | Domestic Equity | 0.33% |
| Neuberger Berman Large Cap Value Inst | 0.70% | Domestic Equity | 0.33% |
| MSIF Small Cap Growth IS | 1.05% | Domestic Equity | 0.33% |
| Fidelity Diversified International Class K | 0.69% | International Equity | 0.50% |
| Fidelity Freedom K 2020 Fund | 0.53% | Target Date | 0.47% |
| Fidelity Freedom K 2025 Fund | 0.56% | Target Date | 0.47% |
| Fidelity Freedom K 2030 Fund | 0.60% | Target Date | 0.47% |
| Fidelity Freedom K 2035 Fund | 0.63% | Target Date | 0.47% |
| Fidelity Freedom K 2040 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2045 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2050 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2055 Fund | 0.65% | Target Date | 0.47% |
| Fidelity Freedom K 2060 Fund | 0.65% | Target Date | 0.47% |

77.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the above ICI Median fee is based on a study conducted in 2016 when expense ratios were generally higher than fees today or even in 2019 given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for target date funds for plans with over 1 billion dollars in assets was 0.56% using 2015 data compared with 0.47% in 2016.  Accordingly, 2019 median expense ratios would be lower than indicated above, demonstrating a greater disparity between the Plan's 2019 expense ratios charted above and the

median expense ratios in the same category.

78.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Investigate Availability of Lower Cost Collective Trusts*

79.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

80.     Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

81.     As noted *supra*, ERISA is derived from trust law.  *Tibble I*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law.  *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."  Restatement (Third) of Trusts, § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

82.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.  Defendants knew this, or at least should have known this, because the Plan included at least one collective trust during the Class Period.

83.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses.  As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

84.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[8]

---

[8] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online.  *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter "*CITs Gaining Ground*").  Many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual funds. *Use of CITs in DC Plans Booming; CITs Gaining Ground*.  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further,

85.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.  Here, the following funds in the Plan in 2018 were available as collective trusts in 2018 and most of the Class Period:

| Fund in Plan | Exp. Ratio[9] | Collective Trust Version | Incep Date | Exp. Ratio[10] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Contrafund Class K | 0.73% | Fidelity Contrafund Commingled Pool | Jan. 17, 2014 | 0.43% | 70% |
| Fidelity Diversified International Class K | 0.69% | Fidelity Diversified International Commingled Pool | Dec. 13 2013 | 0.58% | 19% |
| Fidelity Freedom K 2005 Fund | 0.42% | FIAM Blend Target Date 2005 Q Fund | Oct. 31 2007 | 0.32% | 31% |
| Fidelity Freedom K 2010 Fund | 0.46% | FIAM Blend Target Date 2010 Q Fund | Oct. 31 2007 | 0.32% | 44% |
| Fidelity Freedom K 2015 Fund | 0.49% | FIAM Blend Target Date 2015 Q Fund | Oct. 31 2007 | 0.32% | 53% |
| Fidelity Freedom K 2020 Fund | 0.53% | FIAM Blend Target Date 2020 Q Fund | Oct. 31 2007 | 0.32% | 66% |
| Fidelity Freedom K 2025 Fund | 0.56% | FIAM Blend Target Date 2025 Q Fund | Oct. 31 2007 | 0.32% | 75% |
| Fidelity Freedom K 2030 Fund | 0.60% | FIAM Blend Target Date 2030 Q Fund | Oct. 31 2007 | 0.32% | 88% |

collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

[9] The listed expense figures are as of 2019.

[10] The listed expense figures are as of 2019.

| Fund in Plan | Exp. Ratio[9] | Collective Trust Version | Incep Date | Exp. Ratio[10] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2035 Fund | 0.63% | FIAM Blend Target Date 2035 Q Fund | Oct. 31 2007 | 0.32% | 97% |
| Fidelity Freedom K 2040 Fund | 0.65% | FIAM Blend Target Date 2040 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom K 2045 Fund | 0.65% | FIAM Blend Target Date 2045 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom K 2050 Fund | 0.65% | FIAM Blend Target Date 2050 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom K 2055 Fund | 0.65% | FIAM Blend Target Date 2055 Q Fund | July 12 2011 | 0.32% | 103% |
| Fidelity Freedom K 2060 Fund | 0.65% | FIAM Blend Target Date 2060 Q Fund | May 15 2015 | 0.32% | 103% |
| Fidelity Freedom Income K | 0.42% | FIAM Blend Target Date Fund Q | Oct. 31, 2007 | 0.32% | 31% |

86.     The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

87.     As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, No. 18-3345, slip op. at 5 (8th Cir. May 22, 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda,* 923 F.3d at 329 (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

88.     The following is a sampling of the assets under management during the Class Period:

| Fund in Plan | 2018 AUM | 2017 AUM | 2016 AUM | 2015 AUM | 2014 AUM |
|---|---|---|---|---|---|
| Fidelity Contrafund Class K | $180,455,076 | $190,989,424 | $146,274,249 | $153,029,000 | NA |
| Fidelity Diversified International Class K | $44,874,063 | $56,981,096 | $45,695,069 | $51,730,000 | $51,140,000 |
| Fidelity Freedom K 2005 Fund | $3,328,214 | $3,130,674 | $2,980,076 | $2,625,000 | $2,482,000 |
| Fidelity Freedom K 2010 Fund | $14,700,883 | $16,583,150 | $15,357,026 | $15,438,000 | $18,073,000 |
| Fidelity Freedom K 2015 Fund | $29,860,328 | $35,486,423 | $30,758,572 | $32,142,000 | $32,983,000 |
| Fidelity Freedom K 2020 Fund | $142,344,416 | $154,508,611 | $125,978,134 | $109,099,000 | $101,979,000 |
| Fidelity Freedom K 2025 Fund | $142,133,737 | $140,054,309 | $100,640,796 | $79,073,000 | $67,813,000 |
| Fidelity Freedom K 2030 Fund | $181,948,301 | $180,472,559 | $131,011,400 | $105,753,000 | $91,411,000 |
| Fidelity Freedom K 2035 Fund | $118,099,631 | $113,934,046 | $77,225,399 | $59,307,000 | $48,851,000 |
| Fidelity Freedom K 2040 Fund | $121,013,003 | $121,428,667 | $87,806,045 | $69,409,000 | $61,568,000 |
| Fidelity Freedom K 2045 Fund | $86,309,175 | $82,780,657 | $56,344,010 | $40,492,000 | $31,922,000 |
| Fidelity Freedom K 2050 Fund | $73,574,568 | $68,595,224 | $45,056,791 | $31,561,000 | $23,943,000 |
| Fidelity Freedom K 2055 Fund | $46,478,867 | $37,831,154 | $20,863,675 | $10,902,000 | $5,475,000 |

| Fidelity Freedom K 2060 Fund | $4,501,198 | $1,208,904 | NA | NA | NA |
|---|---|---|---|---|---|
| Fidelity Freedom Income K Index Fund | $9,232,127 | $9,537,914 | 48,774,311 | $7,958,00 | $8,792,000 |

89.     At all times during the Class Period, the above funds had sufficient assets under management to qualify for conversion to collective trusts given that investment managers will waive investment minimums for retirement plans.  Moreover, all of the collective trusts were available during the Class Period.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper available collective trusts and transferred the Plan's investments into the lower cost funds at the earliest opportunity.

90.     There is no good-faith explanation for utilizing higher-cost funds when lower-cost funds are available for the exact same investment.  Indeed, given that the collective trusts were comprised of the same underlying investments as their mutual fund counterparts, and managed by the same investment manager, but had lower fees, they generally had greater returns when looking at the 1, 3, 5, and 10 year average annual returns.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive funds; the only consequence was higher costs for Plan participants.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

91.     Moreover, it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359,

2017 WL 3523737, at * 8 (C.D. Cal. Aug. 16, 2017) ("*Tibble III*"). Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.*, at * 11. This basic tenet of good fiduciary practice resonates loudly in this case given the unreasonable recordkeeping and administrative costs arrangements put in place by Defendants.

92.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

93.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at   http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

94.     The Plan participated in Fidelity's participant revenue credit program through which recordkeeping fees and other Plan administrative costs were paid through the following structure.  The Trustee made annual revenue credit payments, from the funds it received through revenue sharing, to a Revenue Credit Account.   Afterward, the administrator could direct the Trustee to use amounts held in the Revenue Credit Account to reimburse the Sponsor for fees and

expenses associated with services provided to the Plan, or pay such vendors, including the Trustee or third parties, directly.  Further, amounts held in the Revenue Credit Account may be fully utilized each year and any unused amount may be carried over from year to year rather than being remitted back to participants.

95.     Over the years, this arrangement of placing revenue sharing funds into a Revenue Account before disbursement to pay for Plan expenses deprived Plan participants of use of their money and millions of dollars in lost opportunity costs.  A more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

96.     By failing to investigate the availability of certain collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.  Further, to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants, this was a further fiduciary breach that cost Plan participants millions of dollars during the Class Period.

### *Failure to Utilize Lower Fee Share Classes*

97.     To make matters worse, in 2017 the Plan fiduciaries added two new funds but failed to prudently investigate whether the funds were the lowest-cost share class available.

98.     Recently, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share

classes provide identical investments at lower costs – to switch share classes immediately." *Tibble III*, 2017 WL 3523737, at * 13.

99.     The two funds added which cost more than available identical lower share classes were the following:

| Fund in Plan | Years in the Plan | 2018 AUM | Exp. Ratio[11] | Lower Cost Share | Exp. Ratio[12] | % Fee Excess |
|---|---|---|---|---|---|---|
| Harbor Capital Appreciation Inst Class | Since 2014 | $83.8m | 0.68% | Harbor Capital Appreciation Ret Class | 0.58 % | 17% |
| Principal Midcap Fund Inst C1 | Since 2014 | $58.0m | 0.69% | Principal Midcap Fund R6 | 0.59% | 17% |

100.     Defendants knew or should have known of the existence of the above cheaper share classes and therefore also should have immediately identified the prudence of selecting these alternative investments. The Harbor Capital Appreciation Ret Class fund was available as of March 1, 2016 and the Principal Midcap Fund R6 was available as of November 22, 2016.

101.     As noted above, qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds. However, initial investment minimums are generally waived for financial intermediaries and retirement plans.

102.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and selected the lower share classes.

103.     Failure to do so was because either Defendants did not negotiate aggressively enough with their service providers to obtain better pricing or they simply were not paying attention.

---

[11] The listed expense figures are as of 2019.

[12] The listed expense figures are as of 2019.

104.     Nor is it an excuse to select higher cost versions of the same fund to pay for Plan expenses.   As noted above, fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Tibble III*, 2017 WL 3523737, at * 11.

105.     By failing to investigate the use of lower cost share classes, Defendants caused the Plan and its participants to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively-Managed Funds*

106.     As noted *supra*, ERISA is derived from trust law.  *Tibble I*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts, § 100 cmt. b(1).

107.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available   at   https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively-managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*,   available   at   http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively-managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

108.     Indeed, on average funds with high fees perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009)

(hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

109.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

110.    The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed alternative funds in the same fund category.  The chart below analyzes funds in the Plan in 2018 using 2018 expense ratios as a methodology to demonstrate the greater relative expense of the Plan's funds compared to their alternative fund counterparts.

| Fund in Plan | Net Expense Ratio | Passive Alternative | Net Expense Ratio[13] | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2005 Fund | 0.42% | Fidelity Freedom Index 2005 Investor Class | 0.14% | Dec. 2 2009 | 200% |
| | | Fidelity Freedom Index 2005 Inst. Premium Class | 0.08% | June 24 2015 | 425% |
| Fidelity Freedom K 2010 Fund | 0.46% | Fidelity Freedom Index 2010 Investor Class | 0.14% | Oct. 2 2009 | 229% |
| | | Fidelity Freedom Index 2010 Inst. Premium Class | 0.08% | June 24 2015 | 475% |
| Fidelity Freedom K 2015 Fund | 0.49% | Fidelity Freedom Index 2015 Investor Class | 0.14% | Oct. 2 2009 | 250% |

---

[13] As of June 1, 2019, Fidelity Freedom Index Funds – Investor Class' expenses were reduced to 0.12% from 0.14%.

| Fund in Plan | Net Expense Ratio | Passive Alternative | Net Expense Ratio[13] | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| | | Fidelity Freedom Index 2015 Inst. Premium Class | 0.08% | June 24 2015 | 513% |
| Fidelity Freedom K 2020 Fund | 0.53% | Fidelity Freedom Index 2020 Investor Class | 0.14% | Oct. 2 2009 | 279% |
| | | Fidelity Freedom Index 2020 Inst. Premium Class | 0.08% | June 24 2015 | 563% |
| Fidelity Freedom K 2025 Fund | 0.56% | Fidelity Freedom Index 2025 Investor Class | 0.14% | Oct. 2 2009 | 300% |
| | | Fidelity Freedom Index 2025 Inst. Premium Class | 0.08% | June 24 2015 | 600% |
| Fidelity Freedom K 2030 Fund | 0.60% | Fidelity Freedom Index 2030 Investor Class | 0.14% | Oct. 2 2009 | 329% |
| | | Fidelity Freedom Index 2030 Inst. Premium Class | 0.08% | June 24 2015 | 650% |
| Fidelity Freedom K 2035 Fund | 0.63% | Fidelity Freedom Index 2035 Investor Class | 0.14% | Oct. 2 2009 | 350% |
| | | Fidelity Freedom Index 2035 Inst. Premium Class | 0.08% | June 24 2015 | 688% |
| Fidelity Freedom K 2040 Fund | 0.65% | Fidelity Freedom Index 2040 Investor Class | 0.14% | Oct. 2 2009 | 364% |
| | | Fidelity Freedom Index 2040 Inst. Premium Class | 0.08% | June 24 2015 | 713% |
| Fidelity Freedom K 2045 Fund | 0.65% | Fidelity Freedom Index 2045 Investor Class | 0.14% | Oct. 2 2009 | 364% |
| | | Fidelity Freedom Index 2045 Inst. Premium Class | 0.08% | June 24 2015 | 713% |

| Fund in Plan | Net Expense Ratio | Passive Alternative | Net Expense Ratio[13] | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom K 2050 Fund | 0.65% | Fidelity Freedom Index 2050 Investor Class | 0.14% | Oct. 2 2009 | 364% |
| | | Fidelity Freedom Index 2050 Inst. Premium Class | 0.08% | June 24 2015 | 713% |
| Fidelity Freedom K 2055 Fund | 0.65% | Fidelity Freedom Index 2055 Investor Class | 0.14% | June 1 2011 | 364% |
| | | Fidelity Freedom Index 2055 Inst. Premium Class | 0.08% | June 24 2015 | 713% |
| Fidelity Freedom K 2060 Fund | 0.65% | Fidelity Freedom Index 2060 Investor Class | 0.14% | Jan. 12 2014 | 364% |
| | | Fidelity Freedom Index 2060 Inst. Premium Class | 0.08% | June 24 2015 | 713% |

111.    The above alternative funds generally outperformed the Plan's funds in their 3 and 5 year average returns as of 2020 given that they were comprised of virtually identical underlying funds but had lower fees.  Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

112.    These results are not surprising given that in the long-term, actively managed funds do not outperform their passively-managed counterparts.  Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[14]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| | | |

---

[14] Source: https://us.spindices.com/spiva/#/reports

| Large-Cap | S&P 500 | 78.52 |
|---|---|---|
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

113.    A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

114.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

**C.    Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

115.    The structure of this Plan is rife with potential conflicts of interest because Fidelity and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.  Here, the Plan's Trustee is Fidelity, and an affiliate of Fidelity performs the recordkeeping services for the Plan.

116.    This conflict of interest is laid bare in this case where lower-cost Fidelity collective trusts and index funds – materially similar or identical to the Plan's other Fidelity funds (other than

in price) – were available but not selected because the higher-cost funds returned more value to Fidelity.

117.    There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in Fidelity's coffers.

118.    The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Fidelity and its affiliates and ensure that the fees charged by Fidelity and its affiliates were reasonable and in the best interests of the Plan and its participants.  Clearly, Defendants failed this aspect of their fiduciary duties.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Committee Defendants)

119.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120.    At all relevant times, the Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA Section  3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

121.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA Section 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

122.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.   They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.   Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.   The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.   In addition, the Prudence Defendants failed to investigate certain collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.   Likewise, the Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

123.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.   Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

124.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.   In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches as set forth in their Prayer for Relief.

125.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the

circumstances to remedy the breaches.  Accordingly, each Prudence Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Universal and the Board Defendants)**

126.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

127.    Universal and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

128.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

129.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

130.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses,

37

imprudent choices of funds' class of shares, and inefficient fund management styles that adversely affected the investment performance of the Funds' and their participants' assets as a result of the Committee Defendants' imprudent actions and omissions;

(b)     Failing to monitor the processes by which Plan investments were evaluated, the Committee Defendants' failure to investigate the availability of lower-cost share classes, and the Committee Defendants' failure to investigate the availability of lower-cost collective trust vehicles; and

(c)     Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

131.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

132.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

128.   WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund

doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Dated:  June 5, 2020                    **CAPOZZI ADLER, P.C.**

                                        /s/ Mark K. Gyandoh            .
                                        Mark K. Gyandoh, Esquire
                                        PA Attorney ID #88587
                                        **CAPOZZI ADLER, P.C.**
                                        312 Old Lancaster Road
                                        Merion Station, PA 19066
                                        markg@capozziadler.com
                                        (610) 890-0200
                                        Fax (717) 233-4103


                                        /s/ Donald R. Reavey           .
                                        Donald R. Reavey, Esquire
                                        PA Attorney ID #82498
                                        2933 North Front Street
                                        Harrisburg, PA 17110
                                        donr@capozziadler.com
                                        (717) 233-4101
                                        Fax (717) 233-4103


                                        Counsel for Plaintiffs and the Putative Class